IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 13-107-GF-BMM<br>CV 16-87-GF-BMM |
| Plaintiff/Respondent, | |
| vs. | ORDER DENYING § 2255 MOTION<br>AND DENYING CERTIFICATE OF<br>APPEALABILITY |
| SAMANTHA RENEE<br>HEADCARRIER, | |
| Defendant/Movant. | |

This case comes before the Court on Defendant/Movant Samantha Renee

Headcarrier's motion to vacate, set aside, or correct her sentence, pursuant to 28

U.S.C. § 2255. Headcarrier filed the motion pro se. After requiring the United

States to file certain discovery and to serve a copy on Headcarrier, the Court

appointed counsel Daniel V. Donovan to file an amended motion and to ensure that

Headcarrier or counsel were able to review the discovery.

Counsel filed two technical amendments to the original § 2255 motion and determined the discovery produced by the United States had been produced to defense counsel at the time of trial. *See* Notice of Ams. (Doc. 73) at 1-2; Resp. to Order (Doc. 75) at 2-3.

## I. Preliminary Review

Before the United States must respond to the § 2255 motion, the Court must determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). The Court should "eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## II. Background

The case concerned grave injuries inflicted on two separate occasions on M.L.R., a niece of Defendant Headcarrier. At the time of the first incident, in July

of 2013, M. was six months old. At the time of the second incident, on September 4, 2013, M. was eight months old. Headcarrier was 23 years old, pregnant, had a four- or five-year-old son, and was addicted to prescription pain relievers due to rheumatoid arthritis and other issues. She took custody of her niece when Child Protective Services was looking for a home for the girl. Despite her initial attempt to take responsibility for her niece, Headcarrier was unable to care for her properly.

In July 2013, when M. was crying, Headcarrier hit M. on the left side of her head with the back of her hand, "like an adult." M. fell backwards and struck her head on the cement floor. After the assault, M. slept and threw up a lot and would sometimes fall over while sitting.

On September 4, 2013, when M. was again crying, Headcarrier hit her in the back of the head with a baby bottle. Five minutes later, M. had a seizure. She was unable to breathe properly and unable to hold up her head. M.'s injuries seriously impeded her development. M. may have long-term or permanent disabilities, including seizures, cognitive impairment, blindness, and inability to walk, talk, or eat without assistance.

A grand jury indicted Headcarrier on November 22, 2013, on one count of assault resulting in serious bodily injury in violation of 18 U.S.C. § 113(a)(6) (Count 1); one count of assault with a dangerous weapon in violation of 18 U.S.C. § 113(a)(3) (Count 2); one count of felony child abuse in violation of 18 U.S.C. §

1153(b) and Mont. Code Ann. § 45-5-212 (Count 3); and one count of making a false statement to a federal officer in violation of 18 U.S.C. § 1001(a)(2) (Count 4).[1] Conviction on either Count 1 or Count 2 carried a mandatory minimum penalty of ten years and a maximum of life in prison. *See* 18 U.S.C. § 3559(f)(3). The Court appointed Assistant Federal Defender David Ness to represent Headcarrier. Minutes (Doc. 6); Order (Doc. 8).

The parties reached a plea agreement. Headcarrier agreed to plead guilty to Counts 1 and 3 of the Indictment (the September and July assaults, respectively) and waived her right to appeal the sentence. The United States agreed to dismiss Counts 2 and 4 and to give Headcarrier full credit for acceptance of responsibility. Plea Agreement (Doc. 36) at 2-3 ¶¶ 2-3, 7-8 ¶ 6, 8 ¶ 8. Headcarrier pled guilty in open court on June 3, 2014. Minutes (Doc. 34).

Before sentencing, counsel submitted letters from friends and relatives and certificates from a treatment program on Headcarrier's behalf. *See* Letters (Doc. 43). Headcarrier's base offense level was 14. She received upward adjustments because she used a dangerous weapon, she inflicted permanent or life-threatening injury, and M. was a vulnerable victim. Headcarrier also received a three-level downward adjustment for acceptance of responsibility. Her total adjusted offense level was 23. She had no criminal history points and was in category I. Her

---

[1]     Jurisdiction for Counts 1 and 2 was predicated on 18 U.S.C. § 1153(a). Jurisdiction for Count 3 was predicated on subsection 18 U.S.C. § 1153(b). Count 4 was an offense against the United States. Jurisdiction over it arose under 18 U.S.C. § 3231.

advisory guideline range would have been 46-57 months, but the statutory

mandatory minimum term attached to Count 1 overrode the guideline range and set

it at 120 months. *Cf.* U.S.S.G. §§ 5G1.1(b), 5G1.2(a), (c). The Court sentenced

Headcarrier to serve the mandatory minimum sentence of 120 months in prison, to

be followed by three years of supervised release. Minutes (Doc. 48); Judgment

(Doc. 50) at 2-3.

Headcarrier appealed. Counsel moved to withdraw and filed an *Anders* brief.

*See Anders v. California*, 386 U.S. 738 (1967). Following its independent review

of the record, the Ninth Circuit granted the motion to withdraw and dismissed the

appeal on August 3, 2015. Mem. (Doc. 58) at 1-2, *United States v. Headcarrier*,

No. 14-30203 (9th Cir. Aug. 3, 2015).

Headcarrier's conviction became final on November 2, 2015. *Gonzalez v.*

*Thaler*, 565 U.S. 134, 150 (2013). She timely filed her § 2255 motion on July 19,

2016. *See* 28 U.S.C. § 2255(f)(1); Mot. § 2255 (Doc. 60) at 6 ¶ C; *Houston v. Lack*,

487 U.S. 266, 270-71 (1988).

### III. Headcarrier's Claims

Headcarrier claims that trial counsel violated her Sixth Amendment right to

the effective assistance of counsel in several respects. Headcarrier first alleges that

counsel should have moved to suppress her self-incriminating statements. She also

claims that she would have been in a stronger plea-bargaining position had counsel

filed such a motion. Mem. in Supp. of § 2255 Mot. (Doc. 61) ("Mem.") at 5-8.

Headcarrier next asserts that counsel failed to investigate and present important

exculpatory or mitigating evidence regarding Child Protective Services' decision to

place M. in Headcarrier's home and regarding Headcarrier's drug and alcohol

dependence. She claims this evidence would have been useful in plea negotiations,

might have supported a defense, and should have been cited in a request that she be

admitted to the Residential Drug Abuse Prevention program in prison. Mem. at 9-

12. Third, Headcarrier argues that counsel should have hired experts "to review the

victim's medical history and refute the prosecution's theory of causation of the

victim's injuries." *Id.* at 9-10; *see also* Notice of Ams. (Doc. 73) at 1-2. Finally,

Headcarrier claims that counsel provided ineffective assistance because he failed to

raise these issues on appeal. Mem. at 12-13.

## IV. Analysis

*Strickland v. Washington*, 466 U.S. 668 (1984) governs claims of ineffective

assistance of counsel. At this stage of the proceedings, Headcarrier must allege

facts sufficient to support an inference that counsel's performance fell outside the

wide range of reasonable professional assistance. *Id.* at 687-88. Headcarrier also

must allege facts to support an inference that a reasonable probability exists that,

but for counsel's unprofessional performance, the result of the proceeding would

have been different. *Id.* at 694.

**A. Motion to Suppress**

Following the Court's order (Doc. 63), the United States filed and served on Headcarrier a CD containing the discovery that was produced to trial counsel regarding Headcarrier's pretrial interviews with FBI agents. After a year of unsuccessful attempts to allow Headcarrier to view the CD, the Court resorted to appointing counsel to ensure Headcarrier, or someone acting on her behalf, could verify or dispute that the CD contained the discovery received by trial counsel. *See* Rule 7(c), Rules Governing § 2255 Proceedings. Counsel reviewed the CD and concluded that trial counsel had received it. *See* Resp. to Order (Doc. 75) at 3.

With that fact established, the Court reviews Headcarrier's allegations against the expanded record of the case. Headcarrier contends that counsel should have filed a motion to suppress her statements. She alleges:

> A member of the Blackfoot Indian tribe, a sovereign nation with concurrent jurisdiction with the federal government of many criminal acts, was questioned by law enforcement authorities after she took the injure[d] child to the hospital emergency room with injuries incurred in her home. At no time was she either given access to Blackfoot Tribal counsel or legal counsel, or given her Miranda warnings prior to her questioning. There is a serious question as to whether or not given her level of drug addiction that she would have appreciated the warnings even if they had been given. The court record is bereft of any statement by any law enforcement agency that Miranda warnings were given prior to questioning in which Petitioner admitted guilt.
> . . .
> Petitioner promptly brought the child to the hospital, and it received the medical care that it needed, and began to recover from its injuries. There was plenty of time for legal counsel to have been brought into the picture to protect Petitioner from implicating herself

in the incident for which she was prosecuted.

Mem. (Doc. 61) at 6, 7. Headcarrier also states that Child Protective Services should not have placed M. with her in the first place. *See id*. at 5-6, 7. Headcarrier points out that "federal jurisdiction is not always asserted in these matters," her addiction issues were not unique, "[t]here was nothing in Petitioner's background to identify her as a child abuser." *Id.* at 7.

The heart of the claim is that Headcarrier's statement was made without benefit of a *Miranda* warning[2] and/or was involuntary. "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). A guilty plea does not waive the defendant's opportunity to "attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards" defining the "wide range of reasonable professional assistance." *Id.* at 267. Headcarrier's guilty plea means, however, that she must show not only that "some constitutional infirmity occurred in the proceedings," *id.* at 266, but also that her attorney's advice to plead guilty without having litigated the claim "rendered that advice outside the range of competence demanded of

---

[2]     *See Miranda v. Arizona*, 384 U.S. 436, 471-72 (1966).

attorneys in criminal cases," *id.* at 268 (internal quotation marks omitted).

Headcarrier alleges that she "was questioned by law enforcement authorities after she took the injure[d] child to the hospital emergency room with injuries incurred in her home." She argues that she had no access to legal counsel at the hospital, and that she was not given a *Miranda* warning before she was questioned. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1963); Mem. at 6.

For present purposes, the Court assumes the truth of these allegations. The discovery produced to defense counsel includes an audio recording of Headcarrier's interview with two FBI agents on September 16, 2013. This interview took place twelve days after she had taken M. to the hospital. Headcarrier signed a consent form at 11:50 a.m. agreeing to take a polygraph examination. She signed an advice of rights form at 11:55 a.m. *See* Discovery (Doc. 64), Form FD-395, PDF file at 7-8 (under seal). A little more than an hour later, at 1:05 p.m., she gave the statement that the agents recorded.

Headcarrier admitted causing M.'s injury on September 4, 2013, by hitting the back of her head twice with an empty baby bottle. Discovery (Doc. 64), Audio File WS_10028 at 2:23-5:20 (under seal). She admitting having backhanded M. "like an adult" in July 2013. *Id.* at 8:10-9:20. She admitted having lied to the FBI when she made her statement at the hospital on September 4, 2013. *Id.* at 13:35-14:04. At the end of the interview, Headcarrier stated that she had been read her

rights, understood them, and was voluntarily making a statement to agents who had treated her fairly. *Id.* at 14:10-15:04.

Headcarrier appeared tearful and upset when she gave her statement. She was coherent in her explanation of what occurred. She readily understood and responded to questions, relating details and correcting the agent whenever he said something that was wrong or incomplete. The interviewing agents' tone did not appear to be intimidating, hostile, angry, or demeaning. It was neutral and matter-of-fact.

Even assuming that authorities did not provide *Miranda* warnings to Headcarrier before her first statement at the hospital, and, therefore, the statement could not be considered to have been voluntary, twelve days elapsed before her second statement. Headcarrier was not in custody during this twelve-day period. This interval, during which Headcarrier was not in custody, likely purged any taint from the alleged failure to provide Miranda warnings. *Compare, e.g., United States v. Lee*, 699 F.2d 466, 468-69 (9th Cir. 1982) (per curiam) (where second confession was obtained less than 24 hours after first unwarned confession, and no significant intervening event occurred, second confession was tainted by unlawfulness of the first). Moreover, Headcarrier did not plead guilty to the charge of lying to federal agents. The government did not use against Headcarrier the statement that she made at the hospital.

It remains possible, of course, that Headcarrier could testify to very different facts than those suggested by the audiotape and documentary discovery. Even if Headcarrier had testified to different facts, that would show only that counsel *could* have filed a motion to suppress. Headcarrier does not allege facts sufficient to support an inference "that some constitutional infirmity occurred" in her interview. *See Henderson*, 411 U.S. at 266.

Further, any reasonable defense attorney could determine that accepting the United States's plea offer better served Headcarrier's interests. It is not unreasonable to believe that the agents' testimony, backed up by the recording and documentary evidence, would be more persuasive than the defendant's testimony. No reason exists to think Headcarrier could have received a better deal by filing a suppression motion. In fact, she could have made her situation worse. Suppose the Court found, after a hearing, that both of her statements—the one she made at the hospital and the one she made twelve days later—had been voluntary. At that point, there would have been no particular incentive for the United States to forego trial or to offer a plea to only two, rather than three or all four counts.[3] The Court might have found the statement made at the hospital had been involuntary, but the statement of September 16, 2013, had been voluntary. No reason exists to think

_____

[3] The discovery produced by the United States includes a statement from Headcarrier's common-law husband, who told investigators what he saw and heard. *See generally* Audio File WS_10029. He could have been subpoenaed to testify to those facts, excepting only statements made between Headcarrier and himself.

such a finding would have put Headcarrier in a better position than she reached by pleading guilty without filing a motion to suppress. And, of course, by pleading guilty, Headcarrier obtained a three-level reduction in her offense level, *see* U.S.S.G. § 3E1.1; Presentence Report ¶¶ 31-32, as well as the dismissal of Counts 2 and 4.

Headcarrier also objects to tribal officers' failure to provide legal counsel from the Blackfeet Tribe, to the decision to place M. with her in the first place, and to the decision to pursue a federal prosecution. None of these matters play any role in a suppression motion.

Viewed in light of the record of the case and the discovery filed by the United States, Headcarrier's allegations do not support an inference either that counsel's failure to file a motion to suppress had been unreasonable or that Headcarrier had suffered prejudice. Headcarrier's allegations also do not support an inference that the statement she gave on September 16, 2013, had not been Mirandized or had not been voluntary. Neither prong of the *Strickland* test has been met. This claim is denied.

**B. Exculpatory Evidence**

Everyone was aware of the evidence Headcarrier claims counsel should have presented. *Compare* Mem. in Supp. of § 2255 Mot. (Doc. 61) at 2-3, 5-7, 9, *with* Change of Plea Tr. (Doc. 56) at 38:11-44:14; Sentencing Tr. (Doc. 57) at 11:15-

16:3, 23:12-20; Presentence Report ¶¶ 46-47, 52-53, 54-60. It is not exculpatory.

Even assuming that Headcarrier had been suffering serious ill effects from drug or

alcohol withdrawal, or abuse on both occasions when she struck M., she has never

said she was not aware of what she was doing. In her September 16, 2013,

statement, she indicated that she knew what she was doing. Child Protective

Services may be responsible for a bad placement decision, *see* Sentencing Tr.

(Doc. 57) at 14:16-16:3, but Child Protective Services did not cause M.'s injuries.

Headcarrier's allegations do not support an inference either that the United States

might have made a more favorable plea offer or that Headcarrier might have had a

legal defense to Counts 1 and 3.

As to counsel's failure to seek a recommendation for the Residential Drug

Abuse Program, the sentence reduction under 18 U.S.C. § 3621(e)(2)(B) is not

available to defendants imprisoned for violent offenses. Headcarrier is imprisoned

for assault resulting in serious bodily injury and felony child abuse. It was not

unreasonable for counsel to believe she would not have been eligible for a sentence

reduction. In addition, the conditions of her supervised release are aimed at her

drug and alcohol problems. *See* Judgment (Doc. 50) at 3-4.

No support exists for an inference either that counsel's performance was

unreasonable or that Headcarrier suffered prejudice as a result. Neither prong of

the *Strickland* test has been met. This claim is denied in its entirety.

## C. Expert Witnesses

Headcarrier claims counsel should have consulted experts to determine whether M.'s injuries might be explained by something other than Headcarrier's acts. The Court will assume, for the sake of argument, that counsel did not pursue that line of investigation.

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. After the July 2013 assault, M. "slept a lot, 'threw up' a lot, and would fall over while sitting." *See* Offer of Proof (Doc. 32) at 6. After the September 2013 assault, M. was unable to breathe properly or hold her head up, and she had a seizure. *See id.* at 5. These facts were related by Headcarrier in her September 16, 2013, recorded interview. *See also* Scott Report (Doc. 24) at 3-4 (under seal).[4]

M.'s body bore traces of previous abuse, such as what appeared to be a cigarette burn, presumably incurred before Headcarrier took custody of M. Headcarrier does not allege any reason to believe that behavioral signs of serious head injury occurred at any time before Headcarrier struck M. It is mere speculation to suggest that an expert might have said M.'s symptoms in July or September could have been caused by some other means. Moreover, even if M.

---

[4]        This report of an officer's observations at the hospital was included with the United States's expert disclosure for witness Dr. Anna Antonopulos. *See* Mot. for Leave to File Under Seal (Doc. 23) at 2.

suffered other abuse, and even if she was particularly sensitive as a result of that abuse, neither of those facts would cancel, negate, or even mitigate Headcarrier's criminal liability for having committed assault resulting in serious bodily injury or felony child abuse.

In light of Headcarrier's own recorded statement, no reason exists to suppose counsel's performance might have been unreasonable, and no reason exists to suppose she might have suffered prejudice as a result. Neither prong of the *Strickland* test has been met. This claim is denied.

### D. Failure to Raise Issues on Appeal

Headcarrier has not identified a meritorious claim that counsel failed to raise on appeal. Neither prong of the *Strickland* test has been met. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Smith v. Murray*, 477 U.S. 527, 535-36 (1986). This claim is denied.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues

presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Headcarrier's allegations do not meet the relatively low threshold for a COA. The CD provided to counsel in discovery would not support allegations that Headcarrier's statement was involuntary. There was little prospect of success on a suppression motion and, at the same time, Headcarrier could have lost an opportunity to obtain a plea bargain had counsel filed one. As explained at the sentencing hearing, Headcarrier's arguments for mitigation of her responsibility were thoroughly unpersuasive. Headcarrier does not allege any reason to think an expert could have been found to testify that she did not cause M.'s catastrophic injuries. Finally, her claim that counsel should have raised these claims on direct appeal likewise lacks merit. Reasonable jurists would not find any claim makes a substantial showing that Headcarrier was denied a constitutional right. There is no reason to encourage further proceedings. A COA is denied.

Accordingly, IT IS HEREBY ORDERED:

1. Headcarrier's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Docs. 60, 61, 73) is DENIED.

2. The motion to produce a replacement CD (Doc. 69) is MOOT.

3. A certificate of appealability is DENIED. The Clerk of Court shall

immediately process the appeal if Headcarrier files a Notice of Appeal.

4. The Clerk of Court shall ensure that all pending motions in this case and in CV 16-87-GF-BMM are terminated and shall close the civil file by entering judgment in favor of the United States and against Headcarrier.

DATED this 25th day of January, 2018.

Brian Morris
United States District Court Judge